The UNITED STATES

v.

**Shirl F. KAPP, Ronald Klinger, Robert Lewis, Robert Miller and Paul Briggs.**

**Appeal of Paul BRIGGS.**

No. 84-3764.

United States Court of Appeals, Third Circuit.

Argued Nov. 19, 1985.

Decided Jan. 27, 1986.

Certiorari Denied Feb. 24, 1986. See 106 S.Ct. 1220.

Rehearing Denied April 1, 1986.

J. Alan Johnson, U.S. Atty., Paul Brysh (argued), Asst. U.S. Atty., Pittsburgh, Pa., for appellee.

William J. Stepanek, Chardon, Ohio, Edward Heffernan (argued), Cleveland, Ohio, for appellant.

Before HIGGINBOTHAM, SLOVITER and MANSMANN, Circuit Judges.

## OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this appeal we are asked to examine the sufficiency of the evidence supporting jury verdicts of guilty of conspiracy to transport stolen motor vehicles in interstate commerce in violation of 18 U.S.C. §§ 371 and 2312 and of receiving a stolen motor vehicle in violation of 18 U.S.C. § 2313. We have reviewed the evidence in the light most favorable to the prosecution and have determined that the evidence in this admittedly sparse record is sufficient to sustain the verdicts. As well, we have examined the allegations of error and find that the trial judge correctly applied the law and did not abuse his discretion. Accordingly, we will affirm the judgment of sentence.

In a multi-count, multi-defendant indictment, defendant Paul Briggs was charged with one count of conspiracy to transport stolen motor vehicles in interstate commerce in violation of 18 U.S.C. §§ 371 and 2312 (Count I) and with one count of receiving a stolen motor vehicle in violation of 18

U.S.C. § 2313 (Count 10). Three of the five defendants pleaded guilty and Briggs and co-defendant Ronald Klinger were tried before a jury. The jury found Briggs guilty on both counts.

In essence, the facts of this particular case involve the alleged conspiratorial acts of John Gillum, Shirl Kapp and defendant Briggs as they relate to the interstate transportation of a stolen 1978 International tractor truck.

## II.

Briggs challenges the sufficiency of the evidence on two grounds. In reviewing both claims, we must determine whether there is substantial evidence, when viewed in the light most favorable to the government, to uphold the jury's verdict. *United States v. Adams*, 759 F.2d 1099, 1113 (3d Cir.1985). We find the evidence sufficient in this regard as to both claims.

## A.

Briggs first argues that the single sale of the International truck to him was insufficient to make him a member of the conspiracy to transport vehicles in interstate commerce. He asserts that at best the government's proof establishes that he was merely a buyer and not a conspirator to transport the vehicle in interstate commerce.

We begin with the essence of criminal conspiracy which is an agreement, either explicit or implicit, to commit an unlawful act, combined with intent to commit an unlawful act, combined with intent to commit the underlying offense. *United States v. Inadi*, 748 F.2d 812, 817 (3d Cir. 1984), *cert. granted*, —— U.S. ——, 105 S.Ct. 2653, 86 L.Ed.2d 271 (1985); *United States v. Wander*, 601 F.2d 1251 (3d Cir. 1979). The underlying offense involved here is the transportation of stolen vehicles in interstate commerce. In pertinent part 18 U.S.C. § 2312 provides:

> Whoever transports in interstate or foreign commerce a motor vehicle or aircraft, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years or both.

While the government must establish the elements of conspiracy beyond a reasonable doubt, this can be done entirely through circumstantial evidence. *Inadi, supra* at 817. Moreover, the existence of a conspiracy can be inferred "from evidence of related facts and circumstances from which it appears as a reasonable and logical inference, that the activities of the participants ... could not have been carried on except as the result of a preconceived scheme or common understanding." *United States v. Ellis*, 595 F.3d 154, 160 (3d Cir.1979), *cert. denied*, 444 U.S. 838, 100 S.Ct. 75, 62 L.Ed.2d 49 (1979).

We note, however, that the relationship of a buyer and seller, standing alone, without any prior or contemporaneous understanding beyond the mere sales agreement, does not establish conspiracy to transport stolen goods even though the parties know of the stolen nature of the goods. Under these circumstances, there is no joint objective to commit the underlying offense charged here, for the buyer's purpose is to buy and the seller's is to sell. *United States v. Mancillas*, 580 F.2d 1301, 1307 (7th Cir.1978), *cert. denied*, 439 U.S. 958, 99 S.Ct. 361, 58 L.Ed.2d 351 (1978).

Such is not the case before us. The evidence, when viewed as we must in the light most favorable to the government, substantiates circumstances from which Briggs' active participation in the conspiracy to transport stolen motor vehicles in interstate commerce could be inferred. The evidence proves that there is more than a mere sales agreement involved in this case.

At trial the evidence established that co-conspirator John Gillum and another co-conspirator, Shirl Kapp stole a 1978 International tractor truck in Indiana. Kapp and his wife, Sandra Kapp drove the truck to their residence in Shippenville, Pennsylvania. The truck had no certificate of title or documentary registration. Kapp ap-

proached Briggs for this paperwork necessary to operate the truck, telling Briggs that the truck was the product of an insurance scam and the owner "did not want it to turn up again." Briggs provided the fraudulent documents and Kapp made use of the vehicle for several months to haul coal.

Subsequently, Kapp and Gillum sold the International truck to Briggs for $5,000.00 in cash. Gillum specifically told Briggs that the vehicle was stolen and was lacking the legitimate paperwork necessary to operate the truck. Briggs responded by saying: "I've got the paperwork."

Although Briggs initially supplied the fraudulent paperwork to Kapp which would allow the truck to be operated within the state or interstate, this alone is not sufficient to link him to the conspiracy, for given the testimony it is uncertain that he knew the truck was stolen at this point in time; the requisite knowledge is missing at this stage.[1] Rather, it is his providing of the fraudulent paperwork the second time for what he then knew was a stolen vehicle that implicates him in the conspiracy.

Gillum testified that Briggs was informed at the time of the sale of the truck to him that it was a stolen vehicle which did not possess the legitimate certificate of title or documentary registration. To this Briggs affirmatively responded: "I've got the paperwork." When he agreed to supply the paperwork the second time, he knew that the vehicle was stolen. Moreover, he knew that Gillum and Kapp were involved in an unlawful venture which could not meet success (i.e., operating the vehicle in interstate commerce) unless pa-

perwork was produced. By supplying fraudulent certificates of title and registration papers Briggs not only implicitly agreed to participate in the unlawful act but also exhibited the intent to commit the underlying offense. The supplying of the paperwork essential to the conspiracy goes beyond the mere sales agreement and supports the jury's determination that Briggs was a participant in the conspiracy to transport stolen vehicles in interstate commerce. That Briggs is the buyer is immaterial; that he supplied essential paperwork is critical. Accordingly, this sufficiency claim fails.

### B.

Briggs next contends that the government did not introduce sufficient evidence of the interstate character of the 1978 International truck to support his conviction for receiving a stolen motor vehicle in interstate commerce. He argues that by the time he purchased the truck it had lost its interstate character.

■ The question of whether stolen goods transported in interstate commerce retain their interstate character is a question of fact for the jury, *Powell v. United States*, 410 F.2d 710, 712 (5th Cir.1969), which is "based on common sense and administered on an ad hoc basis." *United States v. Garber*, 626 F.2d 1144, 1147 (3d Cir.1980), *cert. denied*, 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981). The interstate character of a vehicle does not necessarily end when its interstate transportation ends. *Powell*, 410 F.2d at 713. The latter determination depends on important factors such as the lapse of time after the

---

1. Briggs argues arguendo that his knowing involvement with a stolen vehicle occurred after its interstate transportation had come to rest. Briggs was charged, however, with conspiracy and neither it nor the substantive underlying offense necessarily requires the actual physical driving across state lines by Briggs as a conspirator. Discussing the concept of transportation in interstate commerce under 18 U.S.C. § 2312 in *United States v. McElroy*, 644 F.2d 274 (3d 1981), *affirmed* 455 U.S. 642, 102 S.Ct. 1332, 71 L.Ed.2d 522 (1982), we recognized that "[A]ssuming the presence of the requisite knowl-

edge and guilty purpose, any driving, whether wholly within the state of origin, state of destination, or from and to, if done as a substantial step in the furtherance of the intended interstate journey is ... we think, within the act." *Id.* at 280, citing *Barfield v. United States*, 229 F.2d 936, 939 (5th Cir.1956).

Judge Higginbotham would hold that it would also have been permissible for a jury to find that when Briggs provided the first set of fraudulent paperwork to Kapp that Briggs knew the truck had been stolen.

interstate transport and what is done with the vehicle after the transport. *Id.* at 713. At this juncture, we must again view the evidence in the light most favorable to the government to determine whether there was substantial evidence connecting the vehicle to interstate commerce. *Id.* at 712.

Gillum testified that both he and Kapp stole the truck in Indiana. Kapp testified, however, that he received the truck from Gillum in Indiana, and although he did not know the truck was stolen at that time, he knew it was undocumented. Kapp further testified that he and his wife drove the truck to Pennsylvania. Kapp then obtained false documentation for the truck from Briggs and used the truck to haul coal within Pennsylvania for three or four months before it was sold to Briggs for $5,000.

Briggs contends that he is "once removed" from the theft in interstate commerce because Kapp did not know that the vehicle was stolen. The jury, however, apparently believed Gillum's testimony that Kapp knew it was stolen.

Both Kapp and Gillum testified that Kapp used the 1978 International truck as a "loaner" while Gillum was repairing another truck for Kapp. Thus, the fact that Kapp hauled coal with the truck for three or four months does not necessarily eliminate the interstate character of the truck, since the jury could have found that the stolen vehicle had not yet come to rest until it was sold to Briggs. This second sufficiency claim also fails.

### III.

In addition to the sufficiency claims, Briggs raises several allegations of trial error. We find no merit to any of the allegations.

Briggs contends that the trial court erred in refusing to charge the jury regarding the fair market value of the 1978 International tractor truck. At trial, government

witness Jerry Howell, owner of the 1978 International, testified that the vehicle was insured for $30,000 and that the insurance company paid him $25,500 because of the theft. The government argued that the jury could infer that Briggs knew the truck was stolen because of the difference between its value and the $5,000 that Briggs actually paid for the truck.

■ In submitting his point for charge, Briggs requested that the district court charge the jury that the government had to prove the value of the truck as an essential element of the case. Value was an essential element, argued Briggs, since the indictment alleged as an overt act that Kapp sold Briggs a stolen 1978 International tractor or on or about December 8–10, 1980 "valued at approximately $30,000." This reference to value in the indictment does not, however, transform the description to an overt act. Moreover, the government is not required either to prove all the overt acts to a conspiracy or all the facts supporting the overt act. *United States v. Adamo,* 534 F.2d 31, 38 (3d Cir.1976), *cert. denied,* 429 U.S. 841, 97 S.Ct. 116, 50 L.Ed.2d 110 (1976). It is sufficient that the government prove a single overt act in furtherance of the conspiracy. *Id.* at 38–39.

■ The district court denied the charge on the ground that value is not an element of the offense defined by 18 U.S.C. § 2313.[2] We find no error. Section 2313 requires the government to prove only that the defendant received or concealed a motor vehicle in interstate commerce which the defendant knew to be stolen. Value is not an element of this offense. Briggs was free to introduce evidence of value to rebut the inference created by the government's evidence; he was not, however, entitled to an instruction on value.

■ Briggs argues that the district court erred by refusing to charge the jury

---

**2.** Section 2313 in pertinent part provides:
Whoever receives, conceals, stores, barters, sells, or disposes of any motor vehicle or aircraft, moving as, or which is a part of, or

which constitutes interstate or foreign commerce, knowing the same to have been stolen, shall be fined not more than $5,000 or imprisoned not more than five years, or both.

on the difference between "suspicion" and "knowledge". Briggs presented the following point for charge:

The word "knowingly", as the term has been used from time to time in these instructions, means that the act was done voluntarily and intentionally and not because of mistake or accident.

Suspicion does not amount to knowledge.

Although the trial judge gave the jury a definition of "knowledge," he refused to charge the jury that "[s]uspicion does not amount to knowledge."

In refusing Briggs' charge, the district court did not abuse its discretion. Under 18 U.S.C. § 2313, the government must prove that the defendant knew that the motor vehicle in question was stolen. Briggs testified that he suspected but did not know that the 1978 International truck was stolen. Clearly a defendant is entitled to a jury instruction on a theory of defense whenever some evidence supports that theory, *United States v. Garner*, 529 F.2d 962, 969–70 (6th Cir.), *cert. denied*, 429 U.S. 850, 97 S.Ct. 138, 50 L.Ed.2d 124 (1976); here, the district court gave the jury a definition of "knowledge" three times. This was sufficient to encompass Briggs' argument that he lacked specific knowledge that the truck was stolen. The district court is not obligated to use the language the defendant proffers. *United States v. Ammar*, 714 F.2d 238, 251 n. 10 (3d Cir.1983), *cert. denied*, 464 U.S. 936, 104 S.Ct. 344, 78 L.Ed.2d 311 (1983).

█ Briggs argues that the government produced insufficient evidence of conspiracy to allow introduction of statements made by Briggs' co-conspirators. Federal Rule of Evidence 801(d)(2)(E) [3] requires the government to establish by a fair preponderance of the evidence that a conspiracy exists and that it included the defendant. *United States v. Gibbs*, 739 F.2d 838, 843 (3d Cir.) (in banc), *cert. denied*, — U.S. —, 105 S.Ct. 779, 83 L.Ed.2d 774 (1984). *See United States v. Ammar*, 714 F.2d at 247. The trial court refused to allow any co-conspirator statements to be introduced into evidence until the government produced evidence of a conspiracy between Gillum, Kapp and Briggs. During Kapp's testimony, and after Mrs. Kapp's testimony, the court ruled that there was adequate evidence produced. Kapp had testified that he received the stolen 1978 International truck from Gillum and transported it, that he sought papers for it, that he told Briggs the truck had been part of an "insurance scam", and that Briggs provided the paperwork. Mrs. Kapp had testified that sometime after the sale of that truck to Briggs, Kapp told Briggs the truck was "hot", meaning stolen, and Briggs was supposed to get rid of it. This evidence was sufficient for the court to conclude that Briggs' participation in a conspiracy was more probable than not. *See Id.* at 250. *United States v. Jannotti*, 729 F.2d 213, 218 (3d Cir.), *cert. denied*, — U.S. —, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984). Therefore, the co-conspirator statements were admissible.

Briggs argues that the district court improperly admitted a certificate of insurance relating to the value of the 1978 International truck when the witness giving testimony as to the value of the truck did not have knowledge of how the document was made, prepared or maintained. Briggs contends that admission of this document denied him the right to confront witnesses against him under the Sixth and Fourteenth Amendments.

The government introduced this certificate during the testimony of Jerry Howell, the original owner of the truck. As we noted above, the government sought to show the value of the truck to raise the inference that Briggs, who paid substantially less than what the government contended was the market value, knew the truck was stolen. Howell also testified that he bought the truck for $41,000 and received an insurance settlement of over $25,000. Howell's testimony as to his purchase price, his insurance coverage, and his

---

**3.** Fed.R.Evid. 801(d)(2)(E) allows an exception to the hearsay rule when a statement is made by a co-conspirator "during the course and in furtherance of the conspiracy."

settlement was based on his first-hand knowledge, and, since he was available for cross-examination on those issues, it was not hearsay. As to relevancy, the district court ruled that the amount of insurance is "some evidence of what the vehicle was worth." We agree.

Briggs' counsel objected to introduction of the certificate of insurance to show the truck's value, stating that the government must produce a representative from the insurance company to explain how that value was determined, so that he could have the opportunity to cross-examine him. The court ruled the certificate admissible, later explaining that it was admissible under the "business record exception" to the rule against hearsay. Fed.R.Evid. 803(6).

We need not address this issue because the admission of the certificate was harmless error in these circumstances; it was, at most, duplicative of Howell's admissible testimony.

Briggs challenges the district court's refusal to admit a tape recording of a conversation between Gillum, who at the time the tapes were made was a government informant, and Kapp. Briggs sought to introduce the tapes as exculpatory on the issue of his knowledge that the truck was stolen. Briggs' counsel contended the tapes were co-conspirator statements admissible under Federal Rule of Evidence 801(d)(2)(E). The district court held that the tapes were inadmissible because they were not offered "against a party" as is explicitly required for admissibility under Rule 801(d)(2).

We agree with the district court. There is no authority for the proposition that the prosecution is a "party" against whom such evidence can be offered. The rule is intended to allow for introduction of co-conspirators' statements as evidence against them as defendants. It cannot be stretched to encompass Briggs' interpretation. *See United States v. Hackett,* 638 F.2d 1179 (9th Cir.1980) *cert. denied,* 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). (Co-defendant's exculpatory hearsay statement inadmissible). Since Briggs

limited the proffer of the tapes to the trial court on that theory, we will not consider whether they would have been admissible under any of the other theories he now advances.

For the foregoing reasons, the judgment of sentence entered by the district court will be affirmed.

SLOVITER, Circuit Judge, dissenting.

I respectfully dissent from the majority's opinion insofar as it affirms the conviction of appellant Paul Briggs on the count of conspiracy to transport vehicles in interstate commerce. I join in the remainder of the majority's opinion.

Briggs was charged with and convicted of two counts of the ten count indictment: one count alleging he was part of a conspiracy to transport stolen motor vehicles in interstate commerce in violation of 18 U.S.C. §§ 371 and 2312, and the other alleging the substantive offense of receiving a stolen motor vehicle in violation of 18 U.S.C. § 2313. Count 1, the conspiracy count, charges that codefendant Shirl Kapp stole a 1977 Peterbilt Tractor; that codefendants Robert Miller, Kapp and Robert Lewis stole a 1973 Kenworth Tractor; that Kapp, Miller and Ronald Klingler transported a stolen 1978 Freightliner Tractor; and that Klingler and Kapp stole a 1981 International Harvester Tractor. Briggs was neither charged with nor implicated in any of those thefts.

The only charge as to Briggs was that Kapp sold a stolen 1978 International Tractor to Briggs, and that Briggs concealed and stored this vehicle in his garage. The sale of the 1978 International Tractor to Briggs was also the basis of the substantive count against Briggs of receiving a stolen motor vehicle.

As the majority correctly notes, the relationship of a buyer and seller does not establish conspiracy to transport stolen goods even though the parties know of the stolen nature of the goods. Majority op. at 1010. What is missing is the element of a joint objective to commit the underlying

offense charged. As this court stated in *United States v. Cooper*, 567 F.2d 252, 253 (3d Cir.1977), "to convict a defendant of participating in a conspiracy, there must be *some* evidence tending to prove that he entered into an agreement and that he knew the agreement had the specific unlawful purpose charged in the indictment." (emphasis in original).

"The sufficiency of the evidence in a conspiracy prosecution requires close scrutiny." *United States v. Cortwright*, 528 F.2d 168, 171 (7th Cir.1975). As we stated in *United States v. Allard*, 240 F.2d 840, 841 (3d Cir.), *cert. denied*, 353 U.S. 939, 77 S.Ct. 814, 1 L.Ed.2d 761 (1957), "The question is whether all the pieces of evidence against the defendant, taken together, make a strong enough case to let a jury find him guilty beyond a reasonable doubt." With these general legal principles in mind, it is necessary to review the evidence presented against Briggs.

The conviction of Briggs is tied to the testimony of two witnesses. Shirl Kapp testified that he transported the stolen 1978 International from Indiana to his residence at Shippenville, Pennsylvania, after it had been pointed out to him by Jack Gillum, and Gillum supplied the key. App. at 88a. Kapp testified that Gillum did not give him any paper or title with the vehicle, and that he proceeded to hunt for paperwork or a title to put on it. He went to several people and eventually wound up with Briggs. Kapp testified he told Briggs that he had a truck that he needed paperwork for, that he had to get back at work, and asked Briggs if he might have any. He told Briggs that the truck was an insurance scam, that it had been burned and that the owner did not want it to turn up again. He testified that Briggs "supplied the paperwork", which consisted of "a title. The same kind of title you get for your car or whatever, that proves ownership." App. at 92a.

Briggs testified that he had an inoperable truck that he was keeping for parts, that Kapp contacted him seeking cab parts, and that he provided Kapp with the truck and its title because he figured Kapp "was as broke as I was." App. at 243a. He denied supplying Kapp the paperwork without the truck. App. at 266a. Kapp's testimony also supports Briggs' story that Kapp contacted him for cab parts. He testified:

Q. At some point you went to Mr. Briggs and told him that you needed parts for a truck. Isn't that correct?

A. Yes, sir.

Q. And isn't it also true that one of the parts you needed is what is called a cab?

A. Well, he give me a whole truck for parts, sir.

Q. Did you give him any money?

A. No, sir. He wouldn't take any money. I offered to pay him.

Q. On the evening that you went over to speak to Mr. Briggs about this—Was it a junked truck. I imagine, or was it a—

A. Yes, sir.

Q. You went over and you told him you needed a junked truck for parts to do what? To reassemble a truck that needed repair?

A. Well, I just needed some parts for the truck that I had already gotten.

Q. And you didn't know what particular truck you wanted at that point. Is that correct? In other words, you didn't have in mind a specific truck that he owned?

A. No, sir.

Q. And you were not aware exactly where the trucks that he owned were on his property. Is that correct?

A. No, sir,—or yes, sir, that's correct. He has got trucks all over his property.

Q. He has a very large piece of property, in fact. Isn't that true?

A. Yes, sir.

App. at 127a–128a. We can assume that the jury could have found that Briggs in fact supplied only the paperwork, as Kapp testified on direct examination. That is not the significant fact in this transaction. Although the majority says that "it is uncertain that [Briggs] knew the truck was stolen at this point in time", Majority op. at

1011, in fact there is no evidence whatsoever in the record to show that Briggs knew that the truck was stolen at the time he supplied the paperwork at Kapp's request.

Briggs' second connection with the truck occurred several months later. In the interval, Kapp had used the truck for several months to haul coal, which was the way he made his living. After Gillum returned Kapp's truck. Gillum wanted to sell the 1978 International and asked Kapp if he knew anybody who would be interested in buying it. Kapp replied that "there's several people that's in trucking in our area and they buy used trucks, new and used." App. at 93a. Kapp knew that Briggs needed a truck because "his GMC had went sour on him, it blowed up or something." App. at 98a. Thereafter, Kapp telephoned Briggs to see if he was interested in buying a truck. Kapp testified:

Q. When you spoke to Mr. Briggs on the phone, did he indicate that he was interested in buying a truck?

A. Yes, sir.

Q. Did you tell him that you were in any particular hurry to buy—to sell the truck?

A. Just that the owner wanted to go back home and if he wanted to see it, that it was there, and to talk to the owner.

Q. So did you set up an appointment for him to come and see the truck at the time?

A. I believe I went down and picked him up.

Q. How much did he pay for that truck?

A. I believe it was $5,000.

Q. When you called him on the phone, did you tell him—When you called him on the phone, you did not know it was a stolen truck. Isn't that true?

A. Yes, sir.

Q. And when you picked him up to go see the truck, you were not aware that it was a stolen truck. Is that true?

A. Yes, sir.

Q. When Mr. Briggs examined the truck, he did not know it was a stolen truck. Is that true?

A. Yes, sir.

Q. Was this truck an International?

A. Yes, sir.

Q. Did you tell Mr. Briggs when he paid his money for this truck that it was a stolen truck?

A. No, sir.

App. at 130a–131a.

Kapp's final testimony with respect to Briggs was to the effect that he told Briggs that the truck was stolen months after the transaction when, as developed by other testimony, he became concerned about the investigation in this case. He testified:

Q. Later on you called Mr. Briggs on the phone and you asked him if you could repurchase the truck. Is that true? Several months later?

A. Yes.

Q. Approximately how long was that?

A. I just couldn't tell you on the time.

Q. Fine. He refused to sell it to you. Isn't that correct?

A. Yes, sir.

Q. And you told him at that time for the first time, it is your testimony, I believe, that you told him that this was a stolen truck.

A. Yes, sir.

Q. He still didn't sell it back to you, did he?

A. No, sir.

Q. Did you advise him to hide it or not to run it?

A. I told him to get rid of it.

Q. He kept running it, though, didn't he?

A. Yes, sir.

Q. As far as you know, he never stopped running it. Is that true?

A. Yes, sir.

App. at 132a–133a.

This is corroborated not only by Briggs' testimony but by the testimony of Mrs. Kapp, another government witness. Briggs testified:

Q. Did someone eventually offer to buy this truck from you?

A. Yes. Some time maybe three or four months before they—the authorities came, either Mr. Kapp sent someone to my house or—he didn't call me, but maybe he sent word over that he wanted to buy the truck or was thinking about buying the truck off me, and I told him that I bought a 1974 International [which Briggs testified that he thought it was] and I wanted to keep it. I had been hunting that for a long time, that particular motor, and I didn't want to sell it; and there was maybe some ill wind that the truck might have been stolen or something, but I didn't believe them, and I figured I was right and I was going to keep my truck, and so I wasn't interested in selling it at no time.

Q. Did you keep on running it after this—

A. I kept right on running it until it expired just a few days or a week or so before the authorities come to my place.

App. at 258a–259a.

Mrs. Kapp also testified that she overheard a conversation in September or October of 1982 between her husband and Briggs, about the International and in which Kapp told Briggs Gillum said the truck "was hot and Mr. Briggs was supposed to get rid of it." App. at 40a.

It is evident that nothing in any of this testimony implicates Briggs in a conspiracy to transport stolen motor vehicles. According to Kapp, who was the individual who handled the transaction with Briggs, Briggs did not know the truck was stolen at the time he purchased it. A fortiori, Briggs could not be implicated in the conspiracy to transport the truck which was stolen and transported months before.

The second witness on whom the government and the majority rely for the conviction of Briggs was John (Jack) Gillum. Although Gillum was implicated in all or almost all of the thefts which were the subject of this indictment, he was not named therein. He had, however, been indicted in 1982 in the Southern District of Indiana on seven counts, agreed to cooperate, and thereafter pled guilty to one count of concealing a stolen vehicle. In 1976, he had been convicted in connection with some stolen lumber.

Gillum admitted to stealing the 1978 International vehicle with Kapp from Indiana, after which Kapp hauled coal with it for awhile. Gillum testified:

Q. And what happened to it after Mr. Kapp was hauling coal?

A. Mr. Kapp and I sold it to Paul Briggs.

Q. And when the vehicle was stolen was there any paper work or title with the vehicle?

.     .     .     .     .

A. Yes. It was my understanding that Sonny had a title for it.

MR. HEFFERNAN: Objection as to what his understanding was.

THE COURT: Sustained.

Q. Do you know—Was there a title or paper work with the vehicle when you stole it?

A. No, ma'am.

Q. Do you know where the title work for that vehicle came from?

A. No, ma'am, I don't.

Q. Did Mr. Kapp tell you?

.     .     .     .     .

THE WITNESS: Yes, he did.

MRS. JORDAN: Your Honor, in accordance with the prior ruling of the Court,—

Q. What did Mr. Kapp tell you about the title work?

.     .     .     .     .

Q. What did Mr. Kapp tell you about the paper work?

A. He told me that he got a title from Mr. Briggs.

App. at 145a–146a.

There were two meetings between Gillum, Kapp and Briggs on the day the 1978 International was sold to him. After Kapp contacted Briggs about buying a truck, Kapp transported Briggs to his place,

which was nearby, to see the truck. Briggs testified he believed it was a 1974 International that "looked rough, but it had the type of motor in it that I wanted." App. at 244a. He told Kapp that the most he would give for it was $5,000. App. at 245a.

Before he went to Kapp's to look at the truck, he had arranged to sell one of his trucks to another buyer. After seeing Kapp's truck, he made arrangements to get a $5,000 check from his buyer and he and his buyer went together to the bank to cash that check. Briggs then called Kapp who came over again and picked him up and took him back to the truck. App. at 246a. Briggs then walked around the truck to make sure that it hadn't been dismantled while he was gone and then said "well it's a deal". Briggs testified:

> Q. I went to hand Mr. Kapp the money (indicating), and there was a—I found out later it was a Mr. Gillum there. He kind of reached in across and he said, "That's my money," and he snatched it. He grabbed it. So it ended up that I don't really think Kapp put the money in his pocket. I think Mr. Gillum got it.

App. at 247a. Briggs also testified:

> Q. When you gave—When you handed Mr. Kapp the money, at that point had he told you that this was a stolen truck?
> A. Absolutely not. I wouldn't have bought it if it was a stolen truck.
> Q. Did Mr. Gillum tell you at this time?
> A. No. I wouldn't have bought it off him either.
> Q. Did you receive anything else?
> A. Yeah. When I made a deal with Mr. Kapp at this time, he gave me a title, and I looked at it and it said Shirl Kapp on it and it said International.
> Q. I show you what had been marked as Defendant's Exhibit T and I ask you if you can identify this.
> A. Yes. This is a copy of the title I received from Mr. Kapp at that time.
> Q. What year does this title say that this truck is, Mr. Briggs?
> A. It didn't. It didn't say what. The year is blank.
> Q. What make does this title say that this vehicle is?
> A. It says it's an International.
> Q. Directing your attention to the back of that exhibit, whose signature appears in the space marked for seller?
>
> .      .      .      .      .
>
> A. Shirl F. Kapp.
> Q. And to whom or what was this vehicle sold?
> A. Excuse me?
> Q. To whom was this vehicle sold to?
> A. It was sold to Aze, Incorporated, Knox, R.D. 2.
> Q. Who signed on behalf of Aze, Incorporated?
> A. I did as company president.

App. at 247a–249a.

The title was admitted into evidence.

The sole testimony which the majority states is the basis for affirming Briggs' conviction of conspiracy appears in the last three lines of the following colloquy from the testimony of Gillum:

> Q. Now you said you sold the vehicle to Mr. Briggs?
> A. That's correct.
> Q. And how much did you sell it to him for?
> A. I think $10,000.
> Q. Did he ever pay you for the vehicle?
> A. He paid $5,000, I think, possibly six.
> Q. And how did he pay you?
> A. Cash.
>
> .      .      .      .      .
>
> Q. Did you ever have any face-to-face dealings with Mr. Briggs?
> A. Yes, I did.
> Q. What did you tell Mr. Briggs about the vehicle?
> A. *I told him it was stolen and we had no paper work for it.*
> Q. *What did he say?*
> A. *He says, "I've got the paper work."*

App. at 146a–147a (emphasis added).

Gillum's testimony is in conflict with that of the government witness Kapp who testi-

fied Briggs was not told at that time that the vehicle was stolen. However, even the majority concedes that the mere purchase of the stolen vehicle would not suffice to make Briggs a conspirator to transport vehicles. Instead the majority relies on Gillum's answer "He says, 'I've got the paper work' ".

However, Gillum's testimony itself shows some confusion with respect to the status of the title to the truck. On cross-examination, he conceded that when the truck was sold to Briggs it already had title to it.

Q. Now the truck, that wasn't titled in Jack Gillum's name, was it, sir?

A. No, sir.

Q. That truck was titled in Sonny Kapp's name. Is that correct, sir?

A. That's correct.

Q. So when that truck was sold to Paul Briggs, it already had a title to it. Is that correct, sir?

A. That's correct.

Q. And that title was in the name of Sonny Kapp, and then it was eventually transferred to Aze Corporation. Is that correct?

A. I'm not sure.

Q. Well, it was sold to Mr. Briggs?

A. That's right.

App. at 174a.

If, as Kapp, Briggs and Gillum also agree, there was already paperwork accompanying the 1978 International, there was no need for Briggs to supply paperwork a second time. Neither the government nor the majority offers any, much less a plausible, explanation.

Furthermore, Gillum, at another part of his testimony, appears to acknowledge that Briggs had no inculpatory knowledge until substantially after he bought the vehicle. He testified:

Q. Did you ever make a comment to Sonny Kapp, "Is Old Man Briggs still running that International?"

.     .     .     .     .

THE WITNESS: Yes, I did.

Q. So you were asking Sonny Kapp about Paul Briggs and his use of that International. Is that correct?

A. That's correct.

Q. And didn't Sonny Kapp ask you if he should tell Paul Briggs about the questionable origin of that 1974 International?

A. Repeat that now?

THE COURT: Would the reporter read the question back? (Last question read.)

A. Yes, I think he did.

.     .     .     .     .

THE REPORTER: "What were the exact words, if you can recall, of what he said to you?"

THE WITNESS: Of what Mr. Kapp said to me?

Q. With regards to Mr. Briggs.

A. I asked him if Mr. Briggs knew what was going on.

Q. And what did Sonny Kapp say?

A. "No."

Q. And what did you say?

A. "Well, just let the son of a bitch rest. Okay?"

Q. And what did Sonny Kapp say to you?

A. "Think I ought to go tell him?"

Q. What did that mean, "Think I ought to go tell him?"

A. That the FBI was investigating the tractor.

Q. Okay, and what was your reply?

A. "No."

App. at 191a–193a.

As this court said in *United States v. Kates*, 508 F.2d 308, 310–11 (3d Cir.1975):

It is imperative, however, that we keep in mind the essential nature of what a conspiracy is in general and what this particular conspiracy was proven to be. It is well established that the "gist" of a conspiracy is an agreement. However slight or circumstantial the evidence may be, it must, in order to be sufficient to warrant affirmance, tend to prove that the appellant entered into some form of agreement, formal or informal, with his

alleged co-conspirators. Similarly, we have stated that the essence of a conspiracy is a "unity of purpose" or "common design."

(footnotes omitted).

In considering a contention that the evidence was insufficient to sustain a conviction of conspiracy, our task is to review the evidence in the light most favorable to the government in order to determine if the factfinder could find the requisite agreement beyond a reasonable doubt. *See United States v. Cooper*, 567 F.2d at 253. When the evidence has, in fact, been inadequate, we have not hesitated to overturn the conviction. *See United States v. Cooper, supra; United States v. Kates, supra; United States v. De Cavalcante*, 440 F.2d 1264, 1272–75 (3d Cir.1971).

This trial involved a number of transactions regarding other defendants and vehicles with which Briggs was not involved. His involvement with the purchase of a stolen 1978 International is not enough to convict him of conspiracy to transport stolen vehicles. The government did not charge Briggs with conspiracy to receive a stolen vehicle. Thus, even if it could have proven that unlawful conspiracy, it was not the crime which it charged. *See United States v. De Cavalcante*, 440 F.2d at 1275.

The majority's theory is that it was Briggs' "providing of the fraudulent paperwork the second time for what he then knew was a stolen vehicle that implicates him in the conspiracy." Majority at 1011. There is no evidence that Briggs knew that the vehicle he was buying was the one involved in the earlier transaction for which he supplied paperwork. Even if we accept Gillum's testimony that he told Briggs at the time of the sale that the vehicle was stolen (which contradicts *all* of the other relevant government witnesses on this point), it is the supposed supply of paperwork the second time that constitutes the element of conspiracy.

The government produced no evidence that Briggs in fact supplied paperwork a second time. No one testified to that, and it defies logic. Kapp testified he gave Briggs the title, which Kapp already had in his name. Gillum agreed that there was indeed paperwork accompanying the truck when it was sold to Briggs. The mere testimony by Gillum that Briggs said "I've got the paper work," is too slender a reed to sustain Briggs' conviction on this count, on which Briggs was sentenced to serve four years in jail.

Even if the evidence is viewed in the implausible manner in which the majority views it, there is yet another disturbing aspect to the majority's analysis. Neither the government nor the majority contends that Briggs knew of or participated in the actual transport of the 1978 International. Concededly, a person who knowingly supplies paperwork to enable those who have transported a stolen truck in interstate commerce to use it or sell it may be found to have evinced a common purpose with the other conspirators and thereby joined the conspiracy. Thus, if there had been any evidence from which the jury could have found that Briggs knew the truck was stolen the first time he provided the paperwork, which assisted Kapp in using the truck or which would have assisted Kapp and Gillum in selling it, Briggs' conviction for conspiracy should be upheld.

However, under the majority's theory, Briggs' nexus with the conspiracy is proven by (1) his supply of paperwork "the second time" and (2) his being told at that time by Gillum that the vehicle was stolen. Since it is uncontradicted on this record that at the time of the sale of the truck to Briggs it already had the necessary papers, the majority fails to explain how Briggs, when providing a second set of papers in connection with the sale to himself, is tied any closer to the common purpose of the conspiracy than if he knowingly purchased a stolen truck. Because the majority concedes that the latter situation would not establish a conspiracy to transport a stolen vehicle, I find its affirmance in this situation inexplicable.

It is questionable whether the evidence to connect Briggs to the conspiracy would be sufficient even under the "slight evi-

dence" rule, now repudiated by the circuits that spawned it, *see United States v. Malatesta,* 590 F.2d 1379, 1382 (5th Cir.), *cert. denied,* 440 U.S. 962, 99 S.Ct. 1508, 59 L.Ed.2d 777 (1979); *United States v. Silverman,* 771 F.2d 1193, 1198 (9th Cir.1985), and not relied upon by the majority. As this court has previously stated, it would be reversible error to charge a jury that it may connect a participating defendant to a conspiracy by "slight evidence", rather than by evidence proving the connection beyond a reasonable doubt. *See United States v. Cooper,* 567 F.2d at 253. More recently, we explained in *United States v. Samuels,* 741 F.2d 570, 573 n. 4 (3d Cir. 1984), that the "slight evidence" rule does not lessen the government's ultimate burden of proving the defendant's guilt beyond a reasonable doubt. Nonetheless, the majority fails to explain or even attempt to explain how the meager evidence introduced as to Briggs suffices under any standard of review to satisfy the evidentiary standard required to support a conviction in a criminal case.